623 F.2d 1303
 20 Fair Empl.Prac.Cas. 792,
20 Empl. Prac. Dec. P 30,204,
23 Empl. Prac. Dec. P 30,900
Alberta GUNTHER, Velence M. Vallance, Marion E.
Vanderzanden, Yvonne M. Hatton, Plaintiffs-Appellants,
v.
The COUNTY OF WASHINGTON, Sheriff Warren Barnes, in his
capacity as Sheriff of Washington County, Captain Stan
Friese and Sergeant Clarence Ramseth, in their capacities as
Washington County Police Officers, Defendants-Appellants.
 No. 76-3448.
 United States Court of Appeals,
Ninth Circuit.
 Aug. 16, 1979.
Rehearing Denied May 1, 1980.
 
 Carol A. Hewitt, Lindsay, Nahstoll, Hart & Krause, Portland, Or., for plaintiffs-appellants.
 Lawrence R. Derr, Washington County Counsel, Hillsboro, Or., for defendants-appellants.
 Appeal from the United States District Court for the District of Oregon.
 Before MERRILL and TANG, Circuit Judges and TAYLOR,* District Judge.
 TANG, Circuit Judge:
 
 
 1
 Plaintiffs Alberta Gunther, Velence Vallance, Marion Vanderzanden, and Yvonne Hatton were four women employed as jail matrons[1] at the Washington County (Oregon) jail. The plaintiffs guarded the inmates in the female section of the county jail; males were employed at a higher rate of pay to guard the inmates in the male section. The jobs of the plaintiffs and two other matrons, Dorothy Holiday and Donna Firth, were terminated when the County decided to move the women prisoners into a facility in an adjacent county.
 
 
 2
 The plaintiffs sued the County, Sheriff Warren Barnes, Captain Stan Friese, and Sergeant Clarence Ramseth[2] under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-1 2000e-17 (1976) ("Title VII"); Holiday and Firth did not sue. Generally, the plaintiffs alleged that the defendants denied them equal pay for equal work and that the defendants terminated them, and later refused to rehire them, in retaliation for their demands for equal pay.
 
 
 3
 The district court segregated the issues of liability and damages. The liability issue was tried to the court on the basis of depositions, witness summaries, exhibits and testimony. The court entered judgment for the defendants on the merits.
 
 
 4
 On appeal, the plaintiffs contend (1) they were denied equal pay for work substantially equal to that performed by male guards, and even if the work was not substantially equal, some of the discrepancy in pay can be explained only by sex discrimination; and (2) the defendants retaliated against plaintiffs for asserting equal pay demands by abolishing their jobs, by forcing Vanderzanden to resign, by noting on personnel forms they would not rehire the plaintiffs, and by refusing to rehire Vallance. We affirm in part, reverse in part, and remand for further proceedings.
 
 
 5
 * Discriminatory Compensation
 
 
 6
 Prior to June 1973, the male section of the jail was staffed by male deputy sheriffs. The deputy sheriffs were assigned to jail duties on a temporary basis only, as part of their training, for periods ranging from several days to one-year. In February 1973, the pay range for a matron was $525-$668; for a deputy sheriff, $736-$940; for a deputy sheriff recruit, $668-$812.
 
 
 7
 Beginning in late June 1973, the deputy sheriffs were replaced by the position of corrections officers. The corrections officers were assigned to the jail on a permanent basis, and the position was open to both males and females. In February 1973, the salary range for a correction officer was $701-$896; the range for a correction officer trainee was $668-$812.
 
 
 8
 The district court found that, although the matrons' jobs may have required as much skill as those of the male guards, the matrons' jobs did not require equal effort or responsibility.[3] The court found that the men and women had substantially different workloads. The men and women worked in separate quarters and the male jailers guarded more than ten times as many prisoners as each matron. Unlike the men, the matrons, because they had fewer prisoners to guard, devoted a significant portion of their working time to clerical duties which all parties agreed was less valuable work. Having determined that the work was not substantially equal, the district court stated "that is the end of the inquiry," and disregarded the plaintiffs' claim that some of the discrepancy in their pay was due to sex discrimination.
 
 
 9
 The plaintiffs dispute these findings. They contend that they were denied equal pay because the male jailers were paid more even though they and the males both performed substantially equal work. Plaintiffs further contend that, even if the work was not substantially equal, the defendants nevertheless violated Title VII if some of the difference in salary between the plaintiffs and the male guards can be attributed to sex discrimination. In order to evaluate these contentions, we must first consider the interrelationship of Title VII and the Equal Pay Act.[4]
 
 A. The Equal Pay Claim
 
 10
 Under the broad coverage of Title VII of the Civil Rights Act of 1964, it is an unlawful employment practice to discriminate against an individual with respect to compensation on the basis of the individual's sex. Section 703(a) (1), codified as 42 U.S.C. § 2000e-2(a)(1). The Equal Pay Act, § 6(d) of the Fair Labor Standards Act, 29 U.S.C. § 206(d), while specifically designed to prohibit discrimination based on sex in the area of compensation, is somewhat narrower in language. The Equal Pay Act prohibits an employer from discriminating "between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill effort and responsibility, and which are performed under similar working conditions . . ."[5] The Act provides four affirmative defenses by which an employer can avoid liability despite proof of unequal pay for equal work.
 
 
 11
 It is plain that the Equal Pay Act overlaps with the coverage of § 703(a)(1) of the Civil Rights Act. See, e. g., Shultz v. First Victoria National Bank, 420 F.2d 648, 659 n.26 (5th Cir. 1969). Both statutes serve the same fundamental purpose of remedying inequality in the area of compensation, and where an equal pay claim has been raised under either or both statutes, the courts have held that the statutes should be construed harmoniously. Id.; Di Salvo v. Chamber of Commerce, 568 F.2d 593, 596 (8th Cir. 1978). As a result, courts have looked to decisions interpreting the Equal Pay Act for guidance in examining equal pay claims asserted under Title VII. See, e. g., Hays v. Potlatch Forests, Inc., 465 F.2d 1081, 1083 (8th Cir. 1972).
 
 
 12
 (1-5) Generally, the Equal Pay Act requires that women receive "equal pay for equal work." See, e. g., Brennan v. Prince William Hospital Corp., 503 F.2d 282 (4th Cir. 1974), cert. denied 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975). Under the Act, the plaintiffs have the burden of proving that they did not receive equal pay for equal work. E. g., Christopher v. State of Iowa, 559 F.2d 1135, 1138 (8th Cir. 1977). They are not required, however, to show that the jobs performed are identical. Peltier v. City of Fargo, 533 F.2d 374, 377 (8th Cir. 1976); Usery v. Allegheny County Institutions District, 544 F.2d 148, 153 (3rd Cir. 1976). Instead, the plaintiffs may prove a violation of the Equal Pay Act by showing that the skill, efforts, and responsibility required in the performance of the jobs is "substantially equal." Usery v. Columbia University, 568 F.2d 953, 958 (2d Cir. 1977); Ridgeway v. United Hospitals Miller Division, 563 F.2d 923, 926 (8th Cir. 1977). To make this showing, actual job performance and content not job titles, classifications or descriptions is determinative. See Katz v. School District of Clayton, Missouri, 557 F.2d 153, 156 (8th Cir. 1977); Angelo v. Bacharach Instrument Co., 555 F.2d 1164, 1171 (3d Cir. 1977). It is the overall job, not its individual segments, that must form the basis of comparison, see Usery v. Richman, 558 F.2d 1318, 1320 (8th Cir. 1977), and, because job duties vary so widely, each suit must be determined on a case-by-case basis. Brennan v. Prince William Hospital Corp., 503 F.2d 282 (4th Cir. 1974), cert. denied, 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975).
 
 
 13
 We apply the "clearly erroneous" standard of review in determining whether the district court correctly found that the jobs were not substantially equal. Fed.R.Civ.P. 52(a); see Di Salvo v. Chamber of Commerce, 568 F.2d 593, 596-97 (8th Cir. 1978). Our review of the record convinces us that the district court's finding on this issue was not clearly erroneous.
 
 
 14
 The district court relied heavily on two factors in making its determination: the amount of clerical work performed by the matrons and the prisoner/guard ratio. The record supports the district court's finding that each jailer was responsible for guarding a substantially greater number of prisoners than each matron. Over a six-month period from April to September 1973, the booking records show that the female prisoner population averaged 1.85 inmates per day. The average daily staff of matrons was about 5.5 matrons. Therefore, approximately three matrons were employed for each woman prisoner. In contrast, the average daily staff of 13 male jailers guarded, on the average, between 50 and 60 male inmates per day, or roughly 4 inmates for every guard. In other words, comparing the male and female prisoner/guard ratio, a male guard was typically responsible for 12 times as many prisoners as a matron.[6]
 
 
 15
 The record likewise supports the district court's conclusion that the matrons did substantially more clerical work than the male guards.[7] Because they had fewer prisoners to guard, the matrons were assigned to do clerical work when they had no other work to perform. As a result, they performed substantial clerical work on every shift, including clerical work relating to the male prisoners. Often this work consumed as much as 50% of their working time. In contrast, the males spent very little time performing clerical work which at most pertained to the booking of male prisoners. The plaintiffs do not seriously dispute that clerical work entails substantially less effort and responsibility than guarding prisoners.
 
 
 16
 The plaintiffs argue that the amount of clerical work and the prisoner-guard ratios were "insignificant" differences that did not justify the wage differentials. According to the plaintiffs, the clerical work was only incidental to their primary duties; the prisoner/guard ratio exaggerates the amount of the males' responsibilities, because the presence of a guard is required no matter how many prisoners there are.
 
 
 17
 The record, however, supports the conclusion that the greater amounts of clerical work and different prisoner/guard ratio makes the position of male guard qualitatively different than the position of matron. The fact that each male guard was required to guard more than ten times as many prisoners as his female counterpart makes a meaningful difference. As the defendants point out, more is required of a prison guard than making sure the cell doors remain locked. Frequent contact between the prisoners and the guard is necessary, and the district court properly concluded that the male guard was forced to exert significantly greater effort and was given significantly greater responsibility because of the much greater number of prisoners for which he was responsible. For these reasons, the district court was not clearly erroneous by concluding that the work was not substantially equal.
 
 
 18
 B. Discriminatory Compensation Claims Not Based on a Demand for Equal Pay
 
 
 19
 If the plaintiffs' Title VII claim was simply a claim that they were denied equal pay for equal work, our inquiry would stop here. The plaintiffs argue more than this, however. They contend that even if their jobs were not substantially equal to those of the male jailers, they should be allowed to prove that some of the discrepancy in wages was due to sex discrimination. Implicitly, they argue that Title VII is broader in scope than the Equal Pay Act with respect to discriminatory compensation claims.
 
 
 20
 Despite the apparent importance of this question, we have found no reported appellate decision that has considered whether Title VII is broader in scope than the Equal Pay Act in this regard. The cases considering the relationship between Title VII and the Equal Pay Act have involved claims that females were being denied equal pay for equal work. See, e. g., Di Salvo, 568 F.2d 593; Orr v. MacNeill, 5 Cir., 511 F.2d 166. Quite properly, these cases have construed the two statutes harmoniously; any other approach may have produced different results depending on whether a plaintiff labeled his cause of action as being brought under "Title VII" or under the "Equal Pay Act." These cases did not involve a situation where, as here, the plaintiffs claimed they were compensated discriminatorily even if they did not perform equal work. We conclude that Title VII is broader in scope than the Equal Pay Act; however, the resolution of this issue requires a close analysis of the relationship between the two statutes.
 
 
 21
 The Equal Pay Act, as discussed, applies only to situations where a plaintiff contends there has been a denial of equal pay for equal work. It does not apply, for instance, where the plaintiff is performing comparable (but not substantially equal) work, or where a position held by the plaintiff is unique, see Rinkel v. Associated Pipeline Contractors, 17 FEP Cases 224, 226 (D.Alas.1978). In contrast, the language of § 703(a)(1) is much broader than that contained in the Equal Pay Act. Title VII, however, is not silent on its relationship with the Equal Pay Act. An amendment to § 703(h) of Title VII, 42 U.S.C. § 2000e-2(h), commonly known as the Bennett Amendment, provides:
 
 
 22
 It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of the (the Equal Pay Act).
 
 
 23
 Two interpretations of the Bennett Amendment are plausible. The Bennett Amendment can be interpreted to incorporate the Equal Pay Act's equal work formula into Title VII. Under this construction, Title VII and the Equal Pay Act would be coextensive in the area of sexually discriminatory compensation and a plaintiff could prove a violation of Title VII only if discriminatory compensation also violated the Equal Pay Act. Alternatively, the Bennett Amendment can be construed as simply incorporating the Equal Pay Act's four affirmative defenses, but not its equal work standard, into Title VII's prohibition. We find the latter interpretation more persuasive.
 
 
 24
 The relevant legislative history, although sparse, is enlightening. The prohibition against sex discrimination in Title VII was included only shortly before the passage of the Civil Rights Act. As a result, the legislative history behind the sex discrimination component of Title VII is "notable only for its brevity." General Electric v. Gilbert, 429 U.S. 125, 143, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). See Manhart v. Los Angeles Department of Water and Power, 553 F.2d 581, 587 (9th Cir. 1976), aff'd in part and rev'd in part on other grounds, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978). Because sex was included in Title VII at the last minute, Senator Bennett became concerned that it might conflict with the Equal Pay Act. He proposed his amendment from the Senate floor. The complete "legislative history" of the Bennett Amendment is set out in the margin.[8]
 
 
 25
 Although scant, this dialogue, if anything, supports the interpretation that, Title VII incorporated the Equal Pay Act's four affirmative defenses but not its equal pay formulation. There is no indication that Congress, by the passage of the Bennett Amendment contemplated that the amendment would apply to the kind of situation now before us. Senator Bennett's comment that the purpose of the amendment was "to provide in the event of conflicts, the provisions of the Equal Pay Act shall not be nullified," 110 Cong.Rec. 13647 (1964), most likely referred to the potential for conflict that would arise if the four affirmative defenses contained in the Equal Pay Act were not included in Title VII. Senator Dirksen's remark that "(a)ll that the pending amendment does is recognize these exceptions, that are carried in the basic act," id., appears to be to the same effect.
 
 
 26
 Language in Manhart v. City of Los Angeles Department of Power and Water, 553 F.2d 581 (9th Cir. 1977), also supports our conclusion that the Bennett Amendment was designed to incorporate only the Equal Pay Act's four affirmative defenses. In Manhart, the plaintiffs challenged a retirement plan requiring greater contributions from women under § 703 of the Civil Rights Act. In noting that such a plan was unaffected by any of the Equal Pay Act's affirmative defenses, we said "all that the Bennett Amendment did was to incorporate the exemptions of the Equal Pay Act into Title VII," Manhart, 553 F.2d at 590. See Laffey v. Northwest Airlines, Inc., 185 U.S.App.D.C. 322, 339, 567 F.2d 429, 446 (1976), cert. denied 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978) ("a sex-predicated wage differential is immune from attack under Title VII only if it comes within one of the four enumerated exceptions to the Equal Pay Act.")
 
 
 27
 Moreover, the broad remedial policy behind Title VII persuades us that Title VII's plain language should not be limited further in the absence of a clear Congressional directive. Legislative enactments in the area of job-related discrimination have long evinced a general intent to accord parallel or overlapping remedies. Alexander v. Gardner-Denver Co., 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Accordingly, the rights created under Title VII are independent of the rights created by other statutes. Laffey, 185 U.S.App.D.C. at 338, 567 F.2d at 445. If we were to limit Title VII's protection against sexually discriminatory compensation practices to those covered by the Equal Pay Act, we would in effect insulate other equally harmful discriminatory practices from review.[9]
 
 
 28
 There is some district court authority that is contrary to our interpretation, see IUE v. Westinghouse Electric Corp., 19 FEP Cases 450 (D.N.J.1979); Wetzel v. Liberty Mutual Insurance Co., 449 F.Supp. 397 (W.D.Pa.1978); Molthan v. Temple University, 442 F.Supp. 448 (E.D.Pa.1977), but we do not find these decisions persuasive. Of these cases only IUE gave substantial consideration to the issue before us. In support of its conclusion that Title VII and the Equal Pay Act are coextensive in this area, the court in IUE relied heavily on cases in which equal pay claims were brought under Title VII. See id. at 456. The general rule stated in the cases cited in IUE that Title VII equal pay claims should be judged under Equal Pay standards is compatible with the view we have taken. Those cases, however, did not consider the issue whether Title VII prohibits conduct outside the scope of the Equal Pay Act, and we see no reason to extend the rationale of those cases to a significantly different issue which they did not address.
 
 
 29
 The court in IUE also relied in part on the 1965 guidelines[10] promulgated by the Equal Employment Opportunity Commission. Id. at 455-56. See 30 Fed.Reg. 14926-8 (1965). To the limited extent that this guideline is authoritative, see General Electric Co. v. Gilbert, 429 U.S. 125, 141, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), we do not regard it as contradictory to our holding here. The guidelines acknowledged that § 703(h) was designed to avoid conflicting interpretations "with respect to situations to which both statutes are applicable." Consistently, we hold that Equal Pay Act Standards apply in Title VII suits when plaintiffs raise a claim of equal pay. When plaintiffs raise a claim under Title VII of discriminatory compensation in the absence of an allegation that they perform substantially equal work, no conflict with the Equal Pay Act arises because the Equal Pay Act is inapplicable.
 
 
 30
 In summary, we hold that, although decisions interpreting the Equal Pay Act are authoritative where plaintiffs suing under Title VII raise a claim of equal pay, plaintiffs are not precluded from suing under Title VII to protest other discriminatory compensation practices unless the practices are authorized under one of the four affirmative defenses contained in the Equal Pay Act and incorporated into Title VII by § 703(h).
 
 
 31
 We note that problems of proof may present substantial barriers to establishing this kind of discriminatory compensation claim. Such problems, however, are not sufficient reasons to foreclose the plaintiff from the opportunity to establish a claim of discrimination.
 
 
 32
 At trial, the plaintiffs offered evidence that a portion of the discrepancy between their salaries and those of the male guards could be ascribed only to sex discrimination.[11] We think that on remand the district court should consider this evidence.
 
 II
 The Retaliations Claims
 
 33
 A. Termination.
 
 
 34
 In December 1973, the County decided to board its prisoners at the Clackamas County Jail and, effective January 15, 1974, to replace the six matrons with two and one-half police stenographers. The plaintiffs contend that the County abolished their jobs in retaliation for their claim for equal pay.
 
 
 35
 The district court found that the County's decision was motivated by legitimate, non-discriminatory objectives, because transferring the women prisoners and replacing them with male prisoners would make better use of jail space, and eliminating the matrons' positions would save money.
 
 
 36
 Under § 704(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, it is an "unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . ."
 
 
 37
 In order to establish a prima facie violation of this section, the plaintiffs must show more than that they protested practices contrary to Title VII and that they were subjected to adverse action by their employer. Miller v. Williams, 590 F.2d 317, 320 (9th Cir. 1979). The plaintiffs must also make a showing that links their conduct with the employer's action. Id. Once the plaintiffs have made this showing, the defendants have the burden of establishing a legitimate, non-discriminatory reason for taking action adverse to the plaintiffs. Id.
 
 
 38
 The district court made no express finding whether the plaintiffs proved a prima facie violation of § 704(a); it found only that the County had a legitimate reason for terminating the plaintiffs. On the record before us, it is questionable whether the plaintiffs showed a sufficient link between their demands for equal pay and the adverse actions taken against them to make a prima facie showing. Assuming arguendo that they have, we find that the district court was not clearly erroneous in determining the County's action was justified by legitimate, non-discriminatory reasons.
 
 
 39
 Sometime in mid-1973, Sheriff Barnes began receiving complaints from the American Civil Liberties Union (ACLU) about the overcrowded conditions in the men's section of the jail. On November 9, 1973 the ACLU filed a suit against the County seeking to correct these conditions.
 
 
 40
 The Sheriff's Office began to consider moving the female prisoners to a jail in one of the adjoining counties and eliminating the matron positions. In late November 1973, the Undersheriff, Charles Sheratt, prepared a memo in which he determined that the county would save $18,000 a year by acting on the proposed changes. Barnes decided that the county could best alleviate the overcrowded conditions in the men's jail by moving the few female prisoners into a regional facility and moving in the men. There were sixteen cells in the women's prison and there were rarely more than three or four women prisoners in the prison at any given time. The County adopted Barnes' recommendation.
 
 
 41
 The district court determined that sound economic considerations justified the County's decision. The Court found that between 1971 and 1973, the number of male prisoners processed by the County jumped from 1,884 to 3,270. An increase in "weekend" sentencing, by which low-risk prisoners were allowed to serve time on weekends, aggravated the overcrowding. Conditions became so bad that prisoners were forced to sleep on the floor.
 
 
 42
 In light of these conditions, we cannot dispute the district court's finding that the abolition of the plaintiffs' job resulted from the legitimate, non-discriminatory purposes of the defendants. Common sense dictated that they alleviate the overcrowding in the men's facility by eliminating the disproportionately more expensive women's facility.
 
 
 43
 B. Denial of Vanderzanden's Request for Leave of Absence.
 
 
 44
 In September 1973, Vanderzanden applied for a leave of absence without pay because she had become physically disabled. Sheriff Barnes denied the request and Vanderzanden resigned. Vanderzanden contends that the defendants denied her leave in retaliation for her demands for equal pay.
 
 
 45
 The district court found that, even if the County had the burden of proving legitimate reasons for discharging Vanderzanden, it had met its burden by showing that Vanderzanden was encouraged to resign because her superiors justifiably believed that she could no longer do the job. The record supports the district court's determination.
 
 
 46
 In 1972 Vanderzanden injured her shoulder in a fall while leaving work. As a result, she was absent from work for four months, two and one-half months of which was unpaid leave.
 
 
 47
 In August 1973, Vanderzanden, then 56 years old, developed blood clots in her leg, a problem that she had intermittently since 1966. She exhausted all her sick and vacation benefits, and applied for a 90 day unpaid leave of absence. Sergeant Ramseth told Vanderzanden that her leave of absence would not be granted. Ramseth said that her poor health made it impossible for her to perform her job effectively. Vanderzanden tendered her resignation.[12] At the time of her resignation, Vanderzanden's doctor would not permit her to return to work because of her ill health.
 
 
 48
 Assuming that Vanderzanden has made a prima facie showing of retaliation, we do not find that the district court's determination that the decision to deny Vanderzanden leave was justified by legitimate business reasons is clearly erroneous. Unfortunate as the County's decision may have been, it was justified by the record. Vanderzanden's prolonged absences from work, her chronic physical ailments, and inability to perform fully her job duties justifies the County's decision.
 
 
 49
 Vanderzanden presented evidence that Undersheriff Sheratt was granted a leave of absence as a means of showing that she was unfairly treated. We do not think that this evidence overcomes the showing made by the defendant. Sheratt was automatically entitled to take his paid leave of absence, and returned to work only after obtaining a release from his doctor.
 
 
 50
 C. Personnel Action Forms.
 
 
 51
 At the time the plaintiffs were terminated, Sheriff Barnes signed a written "Personnel Action" form for each of them. In answer to the question "would you rehire this employee," the Sheriff checked "no" on each form. He checked "yes" on the forms for the two matrons, Holiday and Firth, who were not plaintiffs to this suit.
 
 
 52
 The district court made no express finding as to whether the Sheriff's notation constituted a Title VII violation. It held only that the plaintiffs did not present sufficient evidence to prove that they were harmed by the notation. We find that the plaintiffs did not establish a prima facie violation of § 704(a), and do not decide whether the sheriff's action was harmful to the plaintiff.[13]
 
 
 53
 As we have discussed, to establish a prima facie violation, the plaintiffs must show that there is a link between their assertion of their Title VII rights and the adverse action taken by the defendants. Miller, 590 F.2d at 320. The plaintiffs have failed to demonstrate such a link here. They presented no direct evidence that the Sheriff's notations on the personnel action forms were the result of retaliation for the plaintiffs' request for equal pay. Furthermore, the plaintiffs presented no circumstantial evidence that the Sheriff acted in response to the plaintiffs' equal pay demands. Moreover, the plaintiffs never confronted the Sheriff with their demands and at best the Sheriff had only a vague awareness that matrons in general were demanding equal pay. After careful examination of the record, we can find no evidence to infer that the Sheriff knew the plaintiffs, and not Holiday and Firth, were raising equal pay claims. Only if there is evidence that the Sheriff actually knew that the plaintiffs raised such claims, rather than other matrons, can we infer that the Sheriff gave negative recommendations to the plaintiffs and positive recommendations to the other matrons for vindictive reasons. The plaintiffs presented no such evidence. Having not shown that the defendants were aware which matrons were actively supporting the claim for equal pay, the plaintiffs have not proved the necessary link between their demands and the defendants' adverse action that would establish a prima facie violation of § 704(a).
 
 
 54
 D. Refusal to Rehire Vallance.
 
 
 55
 For a similar reason, we find that the plaintiffs did not establish that the defendants' refusal to rehire Vallance was a prima facie violation of § 704(a).
 
 
 56
 On December 26, 1973, after she had been notified that she would be terminated, Vallance wrote to the Sheriff requesting a transfer to the newly created position of police stenographer. Vallance indicated that she had passed all the necessary civil service tests for the position. Two days later, the Sheriff wrote to Vallance, denying her request and stating that the positions would be filled by somebody else.
 
 
 57
 On January 15, 1974, Holiday and Firth made formal written applications for the police stenographer positions; the Sheriff hired both that same day. Because neither had passed the required civil service examination at that time, their appointments were made provisional pending completion of the tests. Firth later failed the examination and was terminated. Vallance contends that the Sheriff's refusal to rehire her was in retaliation for her equal pay demands.
 
 
 58
 The district court denied Vallance's claim, finding that the Sheriff's appointments of Holiday and Firth were within his discretion under Oregon law. The court noted that Holiday had a good work record and that Firth had a satisfactory one, and that both had more seniority than Vallance.
 
 
 59
 We need not dwell long on this contention. The plaintiffs presented no direct evidence that the defendants chose Holiday and Firth over Vallance for vindictive reasons. Nor can we infer vindictiveness. There is nothing in the record that shows that defendants were aware that it was Vallance, and not Holiday and Firth, who actively sought higher pay.
 
 
 60
 Because the plaintiffs have failed to show a prima facie violation of § 704(a), we need not decide whether the Sheriff's refusal to rehire Vallance was justified by legitimate business reasons.
 
 
 61
 Affirmed in part, reversed in part, and remanded for further proceedings to afford plaintiffs the opportunity to establish a claim of sexual discrimination apart from an equal pay claim.
 
 SUPPLEMENTAL OPINION ON DENIAL OF REHEARING
 TANG, Circuit Judge:
 
 62
 After our opinion in this matter was filed, Gunther v. County of Washington, p. 1303 (9th Cir. 1979), the County petitioned for rehearing, and the Equal Employment Advisory Council (EEAC), an association representing the interests of employers submitted an amicus curiae brief in support. The County now argues that rehearing is necessary because the panel decided an important issue whether Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-1 2000e-17 (1976), may support a theory of sex-based wage discrimination that is not based on a denial of equal pay with minimal discussion of the issue by the parties. The County and the EEAC contend that the panel overlooked legislative history and case law that would have led it to conclude that discrimination in compensation on account of sex does not violate Title VII unless it also violates the Equal Pay Act, 29 U.S.C. § 206(d)(1) (1970).
 
 
 63
 It is true that the parties inadequately presented this issue before the court. Nevertheless, the issue was raised at trial, decided by the district court, and raised on appeal. We were thus obliged to reach the issue. Nevertheless, we take this opportunity to address briefly the arguments made in the petition for rehearing.
 
 I.
 
 64
 The County and the EEAC first contend that the panel overlooked significant legislative history of Title VII in resolving the meaning of the Bennett Amendment. Of the three short items of legislative history that they present, the one on which they most rely is the statement of Senator Bennett, the amendment's sponsor, in which he endorses the interpretation of the amendment that we rejected in Gunther. 111 Cong.Rec. 13359 (1965).
 
 
 65
 Senator Bennett's statement is an interesting piece of "legislative history." The Bennett Amendment was passed in 1964 as part of the original Civil Rights Act. One year later, Senator Bennett inserted in the Congressional Record an excerpt from a law review article in which the article's author suggests that there are two conflicting interpretations of the Bennett Amendment (the same two recognized by the panel), plus a memorandum from his staff to clarify which interpretation Bennett believed to be the correct one. The memorandum concluded that "the amendment means that discrimination in compensation on account of sex does not violate Title VII unless it also violates the Equal Pay Act." Id.
 
 
 66
 Before inserting the article and the memorandum, Senator Bennett explained why he waited a year to explain what he really meant when he introduced his amendment. According to Senator Bennett, under the Senate rules then in effect he was allowed to introduce the amendment but was not allotted time to discuss it. Senator Bennett said that this
 
 
 67
 resulted in action by the Senate without the creation of any legislative history. Thus, the Senate failed in its responsibility to give sufficient guidance to those in the executive branch and elsewhere to those who must interpret and apply the amendments adopted.
 
 
 68
 As an example of what has occurred because of the confusion and near chaos that prevailed on those days, I find myself today under the necessity of trying to create legislative history that should have been created then.
 
 
 69
 As the amendment's sponsor, Senator Bennett's understanding of the amendment might have been entitled to some weight if it had been expressed contemporaneously with the passage of the legislation. See Galvan v. Press, 347 U.S. 522, 526-27, 74 S.Ct. 737, 740, 98 L.Ed. 911 (1954). Coming one year after the Bennett Amendment was enacted, however, the statement at best reflects what was on Senator Bennett's mind when he introduced the amendment and is entitled to no weight. See Manhart v. Los Angeles Department of Power and Water, 553 F.2d 581, 589 (9th Cir. 1976), aff'd in part and rev'd in part on other grounds, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978) (discussion occurring "hours" after passage of Bennett Amendment is not part of amendment's legislative history). Either from a legal standpoint or as a practical matter, Senator Bennett's statement cannot express what was on Congress' collective mind when it acted a year earlier. If Senator Bennett's "clarifying" statement has any significance, it must be as evidence that the amendment was ambiguous on its face and that its contemporaneous legislative history was not enlightening.
 
 
 70
 The second item of legislative history produced by the County and the EEAC also tends to support the panel's original interpretation. This consists of an answer by Senator Clark, a proponent of Title VII, to objections against the proposed legislation:
 
 
 71
 Objection: The sex antidiscrimination provisions of the bill duplicate the coverage of the Equal Pay Act of 1963. But more than this, they extend far beyond the scope and coverage of the Equal Pay Act. They do not include the limitations in that act with respect to equal work on jobs requiring equal skills in the same establishments, and thus, cut across different jobs.
 
 
 72
 Answer: The Equal Pay Act is a part of the wage hour law, with different coverage and with numerous exemptions unlike title VII. Furthermore, under title VII, jobs can no longer be classified as to sex, except where there is a rational basis for discrimination on the ground of bona fide occupational qualification. The standards in the Equal Pay Act for determining discrimination as to wages, of course, are applicable to the comparable situation under title VII.
 
 
 73
 110 Cong.Rec. 7217 (1964).
 
 
 74
 Senator Clark's response is entirely compatible with the court's opinion. Senator Clark's comment that the Equal Pay Act contained different coverage and numerous exemptions reflected an understanding that the Equal Pay Act was to operate separately and independently from Title VII. See Gitt and Gelb, Beyond the Equal Pay Act: Expanding Wage Differential Protections under Title VII, 8 Loy.L.R. 723, 746-48 (1977) (hereafter "Beyond the Equal Pay Act"). His comment that the Equal Pay Act standards are applicable to the "comparable situation" under Title VII is consistent with the panel's analysis of the Gunther plaintiffs' discrimination claims. When a discrimination claim is based on a theory that the plaintiffs are denied equal pay for equal work, Equal Pay Act standards are applicable. See Gunther, at 1310-1314 (9th Cir. 1979). When a claim of discrimination is not based on an equal work theory, it must be analyzed separately under Title VII.
 
 
 75
 Finally, the County and EEAC refer to a comment made by Representative Celler in explaining a number of amendments made by the Senate to Title VII:
 
 
 76
 Provides that compliance with the Fair Labor Standards Act as amended satisfies the requirement of the title barring discrimination because of sex section 703(b).
 
 
 77
 110 Cong.Rec. 15896 (1964). Viewing this solitary comment in its most favorable light, we find that it is insufficient to establish the County's interpretation of the Bennett Amendment in view of the contrary or inconclusive legislative history previously discussed.
 
 
 78
 The County and the EEAC next refer to the statutory language of § 703(h). They argue that, because the first sentence of § 703(h) contains three of the four affirmative defenses contained in the Equal Pay Act, an interpretation that the Bennett Amendment merely incorporated the Equal Pay Act defenses into Title VII renders the amendment meaningless.
 
 
 79
 Initially, it bears emphasis that the language of the Bennett Amendment, allowing a wage differentiation if such differentiation is "authorized by the provisions" of the Equal Pay Act, almost compels the interpretation that the Bennett Amendment merely incorporates only the Equal Pay Act's defenses into Title VII. The Equal Pay Act applies only when a plaintiff has been denied equal pay for equal work, and "authorizes" a differentiation only where one of the four defenses is invoked. The Equal Pay Act does not "authorize" differentiations in the absence of equal work; in those cases, it simply does not apply. Read literally, the amendment only incorporates the Equal Pay Act's defenses. If Congress had intended to say that wage differentials do not violate Title VII unless they violate the Equal Pay Act, it could have easily said so.
 
 
 80
 With this in mind, the County's reliance on the defenses included in the first sentence of § 703(h) cannot, and does not, alter the meaning of the words used in the Bennett Amendment itself. The County argues that the panel's interpretation had no substantive effect because three of the Equal Pay Act defenses were already included in Title VII. Yet the very inclusion of the three affirmative defenses in the first sentence of § 703(h) made no substantive alteration of Title VII. These defenses merely clarified Congress' intent that only discrimination on account of race, color, religion, sex, or national origin is forbidden by Title VII. See 110 Cong.Rec. 12722 (1964) (remarks of Sen. Humphrey). Similarly, the Bennett Amendment need not have effected a "substantive" change. It does not render the Bennett Amendment meaningless to say that it only incorporates the Equal Pay Act defenses, because the Bennett Amendment would still serve the purpose of clarifying Congress' intent with respect to the relationship of Title VII and the Equal Pay Act.
 
 
 81
 Moreover, the fact that the Bennett Amendment incorporated an Equal Pay Act defense the defense allowing differentiation based "on any other factor other than sex" that is not contained in the first sentence of § 703(h) is significant. The incorporation of this Equal Pay defense into Title VII clarifies the burden of proof in an equal pay case brought under Title VII. Under the Equal Pay Act, the burden is on the employer to show that its practice falls within one of the four defenses. See Corning Glass Works v. Brennan, 417 U.S. 188, 196, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974). The incorporation of the fourth affirmative defense into Title VII makes clear that once a Title VII plaintiff has shown that she was denied equal pay for equal work, the burden shifts upon the employer to prove that the differentiation was based on some factor other than sex.[1]
 
 
 82
 The County and the EEAC next contend that the panel ignored significant case law in arriving at its interpretation of the Bennett Amendment.
 
 
 83
 Although we look to the reasoning of other circuits and district courts for guidance, we are bound only by decisions rendered in this circuit. See Allstate Insurance Co. v. Stevens, 445 F.2d 845, 846 (9th Cir. 1971). The only case arising from this circuit that discussed the Bennett Amendment was Manhart v. City of Los Angeles Department of Water and Power, 553 F.2d 581 (9th Cir. 1976), aff'd in part and rev'd in part on other grounds, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978). Although the court did not address the present issue, it was obliged to address the Bennett Amendment and the Equal Pay Act affirmative defenses in the context of suit brought under Title VII to challenge a retirement plan. The court specifically noted, in discussing the Equal Pay Act's affirmative defenses, that "all the Bennett Amendment did was to incorporate the exemptions of the Equal Pay Act into Title VII." Id., 553 F.2d at 590. Although arising in a different context, the express language of this circuit cannot be readily disregarded. Nevertheless, discussion of case law in other circuits and district courts may be enlightening in showing the ambiguity and confusion that has often characterized consideration of this issue.
 
 
 84
 The only appellate case that has specifically recognized the relationship between Title VII, the Equal Pay Act and the Bennett Amendment is Christensen v. Iowa, 563 F.2d 353 (8th Cir. 1977). In Christensen, however, the majority opinion specifically declined to address whether Title VII plaintiffs had to prove a violation of the Equal Pay Act to succeed on their equal pay claims, finding that the plaintiffs had not established a prima facie case under Title VII. Id. at 355.
 
 
 85
 Other courts, although sometimes assuming or implying that a Title VII plaintiff could not succeed on her wage-discrimination claim unless she could prove a violation of the Equal Pay Act, have involved equal pay-type claims. See Orr v. MacNeill & Son, Inc., 511 F.2d 166 (5th Cir.), cert. denied, 423 U.S. 865, 96 S.Ct. 125, 46 L.Ed.2d 94 (1975); Ammons v. Zia, 448 F.2d 117 (10th Cir. 1971). These equal pay-type Title VII claims, of course, require analysis under Equal Pay Act standards. See Gunther, at 1310-1314 (9th Cir. 1979). Although the panels in both Orr and Ammons appeared to assume that a Title VII plaintiff claiming wage discrimination could prevail only if she proved a violation of the Equal Pay Act, in neither case did the court analyze the meaning of the Bennett Amendment and its effect on the relationship between the Title VII and the Equal Pay Act. See Gitt and Gelb, Beyond the Equal Pay Act at 752-55. This assumption that a Title VII plaintiff could prevail only by establishing an equal pay violation has been perpetuated in later cases involving only equal pay claims, where statements limiting the scope of Title VII were unnecessary to decide the case.
 
 
 86
 The failure of the courts to analyze the meaning of the Bennett Amendment and the relationship of the two acts has resulted in an inconsistent approach that underscores the ambiguity of the Bennett Amendment. If the Bennett Amendment really means, as the County contends, that a plaintiff claiming wage discrimination can succeed under Title VII only if the discrimination also violates the Equal Pay Act, then logically the Bennett Amendment should incorporate into Title VII not only the equal work formula of the Equal Pay Act, but also the Act's exemptions, employers, periods of limitations, and all other differences in coverage between the acts.[2] Yet, not only have the courts and the County failed to articulate whether the Bennett Amendment incorporates the entire Equal Pay Act or just its equal pay formula, they have not even recognized that two extremely different formulations of their position exist.
 
 
 87
 Several of the district court cases cited by the County have exhibited this apparent inconsistency. For example, in Molthan v. Temple University, 442 F.Supp. 448 (E.D.Pa.1977), the district court considered equal pay claims under Title VII even though the claims would have been time-barred under the Equal Pay Act. In Howard v. Ward County, 418 F.Supp. 494, 503 (D.N.D.1976), the court held that the plaintiffs could assert claims under Title VII even though, as public employees, they could not recover under the Equal Pay Act.
 
 
 88
 Indeed, the County's defense of this case suffers from the same inconsistency. The Gunther plaintiffs sued under Title VII because, during the time of their alleged discrimination, the Equal Pay Act did not apply to public employees. Gunther, at 1308 n.4 (9th Cir. 1979). Consistent with the position it now appears to advocate, the County should have moved to dismiss the plaintiffs' suit on the ground that its conduct could not have violated Title VII because it did not violate the Equal Pay Act. The County's failure to do so reflects on the failure of the courts to analyze and articulate the meaning of the Bennett Amendment, as well as the ambiguous nature of the amendment itself. This court was certainly warranted in not following the inadequate analyses and assumptions perpetuated by other courts.
 
 
 89
 Finally, the County and the EEAC argue that the legislative history of the Equal Pay Act evidences Congress' intent carefully to establish standards against wage discrimination and that Congress could not have intended to disturb those standards when it hastily included sex in Title VII. This argument, however, cuts more forcefully in the other direction. The same Congress that enacted the Equal Pay Act enacted Title VII one year later. Thus, when the Congress included sex into Title VII it was fully aware, from the previous year's hearings, of the employment problems of women. It may have believed that the Equal Pay Act by itself was inadequate to remedy sex discrimination, or that broader protections were necessary. See Gitt and Gelb, Beyond the Equal Pay Act at 744-45.
 
 
 90
 (26-29) In any event, our interpretation of the Bennett Amendment in Gunther does not "nullify" the provisions of the Equal Pay Act. The County and the EEAC emphasize that Congress, in adopting the Equal Pay Act, rejected "comparable" work standard. The effect of our decision will not be to substitute a "comparable" work standard for an "equal" work standard. Where a Title VII plaintiff, claiming wage discrimination, attempts to establish a prima facie case based solely on a comparison of the work she performs, she will have to show that her job requirements are substantially equal, not comparable, to that of a similarly situated male. The standards developed under the Equal Pay Act are relevant in this inquiry. In most cases, an equal work theory will provide the most practical method of establishing a prima facie case of wage discrimination. All we hold here is that a plaintiff is not precluded from establishing sex-based wage discrimination under some other theory compatible with Title VII. It is unnecessary to determine now what theories might be feasible. We do note that, because a comparable work standard cannot be substituted for an equal work standard, evidence of comparable work, although not necessarily irrelevant in proving discrimination under some alternative theory, will not alone be sufficient to establish a prima facie case.
 
 
 91
 The Gunther plaintiffs apparently presented evidence of intentional sex discrimination that was not considered by the district court because the district court believed that disposition of the equal pay claims was the end of the inquiry. It is unclear from the record whether the plaintiffs were prevented from presenting other evidence that might have established a claim of sex discrimination. Because of the district court's familiarity with this case, the extent of the further proceedings needed to consider the plaintiffs' alternative claims, such as the need for an evidentiary hearing, is committed to its discretion.
 
 
 92
 The petition for rehearing is denied.
 
 
 
 *
 Honorable Fred M. Taylor, Senior United States District Judge for the District of Idaho, sitting by designation
 
 
 [1]
 The matron's job titles were periodically readjusted. For the sake of consistency, we use the term "matron" throughout
 
 
 [2]
 Sheriff Barnes supervised Captain Friese and Sergeant Ramseth. Friese supervised the persons working in the corrections division, including the matrons and Ramseth. Ramseth's duties related primarily to the handling of prisoners and he apparently had limited authority over the matrons
 
 
 [3]
 In its analysis, the district court did not distinguish between the deputy sheriffs who worked in the jail, and their replacements, the corrections officers. The record shows that the in-jail duties of the deputy sheriffs and the corrections officers were the same and thus, we likewise find it unnecessary to draw a distinction in comparing their duties to those of the matrons. We do note because the deputy sheriffs must be certified as police officers by the State of Oregon they possess skill and training that the matrons do not have
 
 
 [4]
 The plaintiffs did not sue under the Equal Pay Act. The Equal Pay Act did not apply to the government employees until May 1, 1974. The Fair Labor Standards Amendments of 1974, Pub.L. 93-259, § 1(a), Apr. 8, 1974, 88 Stat. 55. The plaintiffs' jobs were terminated on January 15, 1974 and thus their claims are cognizable only under Title VII
 
 
 [5]
 In full, 29 U.S.C. § 206(d)(1) (1970) provides: No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex:
 Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.
 
 
 [6]
 The parties are not in complete agreement as to importance that should be assigned to the various statistical evidence introduced at trial. We agree with the district court that the average daily census more accurately reflects the prison's population. The prison's yearly census is not nearly as accurate, because it does not account for the widely-varying lengths of incarceration among the prisoners
 The plaintiff also claims that the average daily population in the women's jail was 3.9 inmates per day, rather than the 1.8 figure provided by the defendants and used by the district court. We have examined both computations and find that the district court's choice of figures was not erroneous.
 
 
 [7]
 This district court found that the clerical duties performed by the matrons included processing fingerprint cards and mug shots; filing reports and mug shots; filling out F.B.I. reports; keeping mail and medical records; recording deputy sheriffs' activities; and censoring mail
 
 
 [8]
 Mr. BENNETT. Mr. President, I yield myself 2 minutes
 The PRESIDING OFFICER. The amendment will be stated.
 The legislative clerk read as follows:
 On page 44, line 15, immediately after the period, it is proposed to insert the following new sentence:
 It shall not be unlawful employment practice under this title for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 6(d) of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 206(d)).
 MR. BENNETT. Mr. President, after many years of raving by members of the fair sex in this country, and after very careful study by the appropriate committees of Congress, last year Congress passed the so-called Equal Pay Act, which became effective only yesterday. By this time, programs have been established for the effective administration of this act. Now, when the civil rights bill is under consideration, in which the word 'sex' has been inserted in many places. I do not believe sufficient attention may have been paid to possible conflicts between the wholesale insertion of the word 'sex' in the bill and in the Equal Pay Act. The purpose of my amendment is to provide that in the event of conflicts, the provisions of the Equal Pay Act shall not be nullified.
 I understand that the leadership in charge of the bill have agreed to the amendment as a proper technical correction of the bill.
 If they will confirm that understanding, I shall ask that the amendment be voted on without asking for the yeas and nays.
 Mr. HUMPHREY. The amendment of the Senator from Utah is helpful. I believe it is needed. I thank him for his thoughtfulness. The amendment is fully acceptable.
 Mr. DIRKSEN. Mr. President, I yield myself 1 minute.
 We were aware of the conflict that might develop because the Equal Pay Act was an amendment to the Fair Labor Standards Act. The Fair Labor Standards Act carries out certain exceptions.
 All that the pending amendment does is recognize those exceptions, that are carried in the basic act.
 Therefore, this amendment is necessary, in the interest of clarification.
 The PRESIDING OFFICER. (Mr. RIBICOFF in the chair). The question is on agreeing to the amendment of the Senator from Utah. (Putting the question.)
 
 
 [110]
 Cong.Rec. 13647 (1964)
 
 
 [9]
 Assume for example, that an employer tells a female worker, not employed at a position that is substantially equal to that performed by a male, that he would pay her $30 a week more if she was male. For want of a male counterpart performing equal work, such blatant discrimination would not be prohibited by the Equal Pay Act. Rinkel, 17 FEP Cases at 226. We find no indication, however, that the Bennett Amendment was intended to legalize such practices under Title VII. Likewise, in a situation where primarily women are employed in a type of job that is comparable but not substantially equal to that performed by men, an employer is free under the Equal Pay Act to decrease the wages of the women solely because of their sex. Such a practice is prohibited by the plain language of § 703 and will continue to be under our interpretation of the Bennett Amendment
 
 
 [10]
 This guideline, formerly codified at 29 C.F.R. § 1604.7 (1966) stated that:
 (a) Title VII requires that its provisions be harmonized with the Equal Pay Act (section 6(d) of the Fair Labor Standards Act of 1938, 29 U.S.C. 205(d)) in order to avoid conflicting interpretations or requirements with respect to situations to which both statutes are applicable. Accordingly, the Commission interprets section 703(h) to mean that the standards of equal pay for equal work set forth in the Equal Pay Act for determining what is unlawful discrimination in compensation are applicable to Title VII. However, it is the judgment of the Commission that the employee coverage of the prohibition against discrimination in compensation because of sex is coextensive with that of the other prohibitions in section 703, and is not limited by section 703(h) to those employees covered by the Fair Labor Standards Act.
 
 
 [11]
 For instance, Sheriff Barnes testified that he thought the disparity between the salaries of the matrons and the deputies should have been less. In fact, the sheriff had previously attempted to upgrade the salary of the matrons
 
 
 [12]
 The parties dispute whether Vanderzanden was "terminated" or "forced to resign". We find that the characterization is immaterial and assume that Vanderzanden was terminated
 
 
 [13]
 The fact that the district court failed to make an explicit finding of fact on the existence of a prima facie violation does not preclude us from deciding this issue, especially where the record consists primarily of documentary evidence. See Magna Weld Sales Co. v. Magna Alloys & Research Pty., 545 F.2d 668, 671 (9th Cir. 1976); Armstrong v. Collier, 536 F.2d 72, 77 (5th Cir. 1976)
 
 
 [1]
 For example, even if an employer could show that a sex classification was justified as a bona fide occupational qualification under Title VII, see 42 U.S.C. § 2000e-2(e), the employer might still be liable for a discriminatory wage differential if unable to prove that the differential was the result of any other factor other than sex. See Sullivan, The Equal Pay Act of 1963: Making and Breaking a Prima Facie Case, 31 Ark.L.Rev. 545, 547 n.14 (1978)
 
 
 [2]
 For example, the Fair Labor Standards Act exempts numerous employees from coverage under its provisions, see 29 U.S.C. § 213; no similar exemptions are contained in Title VII. See also Sullivan, The Equal Pay Act of 1963: Making and Breaking a Prima Facie Case, 31 Ark.L.Rev. 545, 546 nn. 9-13 (1976)